Kathryn A. Stebner, State Bar No. 121088
Brian S. Umpierre, State Bar No. 236399
**STEBNER GERTLER GUADAGNI & KAWAMOTO**
**A Professional Law Corporation**
870 Market Street, Suite 1285
San Francisco, CA  94102
Tel:  (415) 362-9800
Fax:  (415) 362-9801

Guy B. Wallace, State Bar No. 176151
Mark T. Johnson, State Bar No. 76904
Jennifer U. Bybee, State Bar No. 302212
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel:    (415) 421-7100
Fax:    (415) 421-7105

*Attorneys for Plaintiff and the Proposed Class*

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Joseph DeCarlo; on his own behalf, and on behalf of others similarly situated,<br><br>            Plaintiff,<br><br>vs.<br><br>Watermark Retirement Communities, LLC; and Does 1 - 100,<br><br>            Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1.  VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT (Cal. Civ. Code § 1750 *et seq.*)<br>2.  UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES (Cal. B&P Code § 17200 *et seq.*)<br>3.  ELDER FINANCIAL ABUSE (Cal. W&I Code § 15610.30)<br><br><br>**JURY TRIAL DEMANDED** |

1

## INTRODUCTION

1.      Plaintiff Joseph DeCarlo (hereinafter "Plaintiff") and the proposed Class bring this action for injunctive relief and damages to stop the unlawful and fraudulent conduct of Watermark Retirement Communities, LLC and Does 1 – 100 (collectively "Watermark" or "Defendants") as set forth below.

2.      Watermark has engaged in a scheme to defraud seniors, persons with disabilities, and their family members at its assisted living facilities in California by falsely representing to all residents in its admission contracts that each resident will be provided the care services (such as assistance with bathing or showering, assistance with dressing and grooming, assistance with toileting, escorts to meals and activities,  night checks, assistance with meeting routine medical and dental needs, additional housekeeping and personal laundry)  that the resident needs as determined by Watermark's resident assessment system and in exchange for a fee,  without disclosing the  material fact that its company-wide staffing policies and practices are insufficient to meet those needs and  result in residents not receiving care services which Watermark assessed them as needing and for which they paid.

3.      Defendants' conduct is false and misleading because, as a matter of corporate policy and practice, Watermark's policies and procedures regarding staffing are deficient and do not ensure sufficient staffing capacity to provide residents with the care services they were assessed as needing by Watermark's assessment system. Thus, Watermark does not staff its facilities at a level to consistently provide the services that it assessed its residents to need in the aggregate. As a result, Plaintiff and the putative Class often do not receive the services which Watermark promised and for which they paid money.

4.      Plaintiff alleges upon information and belief that Watermark conceals and fails to disclose the material fact that its corporate policies and procedures regarding staffing are deficient and do not provide sufficient staffing in the aggregate to meet residents' assessed needs as determined by Watermark's assessment system.  In particular, Watermark's staffing policies and practices are not capable of providing sufficient numbers of trained staff to provide promised care

CLASS ACTION COMPLAINT

1    services to its residents.  Thus, Plaintiff and putative class members fail to receive the services

2    Watermark promised to provide.

3        5.    In its form admission agreements, Watermark uniformly represents to each new

4    resident that (a) each resident will receive the care that he/she requires; (b) facility staff will

5    determine the care required for each resident through the pre-admission assessment process; and

6    (c) the amount of care needed by the resident will be translated into points for which the resident

7    will be charged on a monthly basis.  The reasonable consumer understands these representations to

8    mean that, as a matter of policy and practice, Watermark has sufficient trained staff to provide

9    residents with the amount and type of care that Watermark has determined to be necessary through

10   its assessment system.

11       6.    Watermark's corporate assessment form lists the functional, behavioral, and special

12   medical needs categories for which a resident may be assessed as needing assistance. Each

13   category contains within it specific, defined tasks detailing the level of assistance Watermark

14   determines is required by the resident. Watermark allots each task in every category a specific

15   number of "minutes per month." For example, in March 2022 Watermark scored Mr. DeCarlo at

16   level 3 for "oral medications," which requires "routine medication management with five to eight

17   medications and three or less passes." Per the assessment form, Watermark's time standard for the

18   provision of this service alone is 923 minutes per month. Thus, by calculating the aggregate time

19   required to provide the services Watermark assessed residents as needing on any given day,

20   Watermark can determine the total number of staff required to deliver the services for which it is

21   billing those residents.

22       7.    Watermark has engaged in a policy and practice of violating the Consumer Legal

23   Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, committing Elder Financial Abuse, Cal.

24   Welf. & Inst. Code § 15610.30, and engaging in unlawful, unfair, and fraudulent business

25   practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§

26   17200 *et seq.* Watermark has a corporate policy and practice of understaffing its facilities which

27   often results in the denial of care services to its residents.  Watermark's policies and procedures

28

CLASS ACTION COMPLAINT

regarding staffing are not reasonably designed to deliver the care services promised in the residents' assessments and Personalized Care Plans. Watermark's facilities lack an essential and reasonably expected attribute – sufficient staffing capacity to provide residents with the care services they were assessed as needing.  The result of this policy and practice is that residents of Watermark's facilities are not receiving the services which Watermark promised and for which residents paid.

8.    Watermark does not disclose and conceals these crucial and material facts from residents (including Plaintiff), their family members, and the consuming public.

9.    Watermark's misrepresentations, misleading statements, and omissions about the manner in which its facilities are staffed and its use of an assessment system that does not have the capacity to provide assessed services on a consistent basis are material to the reasonable consumer.  Seniors and/or their family members consider of great importance the quality of care and staffing provided by the assisted living facility they select. They choose an *assisted* living facility based on the expectation that they will receive the quantity and quality of care that they need, particularly as those needs change with age.  A staffing system or policy that lacks an essential and reasonably expected attribute – staffing capacity to provide assessed services –will not provide services to residents on a consistent and reliable basis. It is therefore a matter of fundamental importance to the reasonable consumer to know that Watermark does not staff its assisted living facilities at a level to consistently provide the care services it assesses its residents as needing and for which they are charged monthly fees.

10.    Through its representations and nondisclosures, Watermark deceives residents and family members and all putative class members into paying significant amounts of money in the form of Membership Fees to enter the facility in amounts that they otherwise would not pay.  For example, Mr. DeCarlo was charged a "Membership Fee" of $15,000.

11.    Watermark's use of a resident assessment system that lacks sufficient staffing capacity to provide assessed care services places all Watermark residents at an unnecessary risk of harm.  That risk is particularly acute because of the vulnerable nature of the targeted population of

1  seniors and residents with disabilities. It also forces residents to live in an unsafe environment due

2  to the resulting inadequate supervision and care of residents in general.

3        12.    If Plaintiff had known the true facts that, as a matter of corporate policy and

4  practice, Watermark does not and cannot provide staffing at levels sufficient to meet the assessed

5  needs of residents as determined by Watermark's assessment system, he would not have agreed to

6  enter Watermark or paid Watermark significant amounts of money in new resident fees and

7  monthly charges, or he would have insisted on paying a lower price. If the putative class members

8  had known the true facts about Watermark's corporate policy and practices regarding staffing,

9  including but not limited to the facts that Watermark does not provide staffing at levels sufficient

10 to meet the assessed needs of residents, they would not have agreed to enter Watermark or paid

11 Watermark significant amounts of money in new resident fees and monthly charges, or they would

12 have insisted on paying a lower price. As a result of Watermark's common policy and procedure

13 of employing a resident assessment system that does not have the capacity to provide residents

14 with assessed services on a consistent basis, Plaintiff and putative class members did not (and

15 cannot) receive the staffing Watermark promised to provide in its admission contracts and for

16 which they have paid money.

17       13.    This action seeks to require Watermark to cease and desist its ongoing violations of

18 law.  With respect to the CLRA, the UCL, and the Elder Financial Abuse statute, this action seeks

19 to require Defendants to disclose to prospective and current residents, their family members or

20 responsible parties, and the class that Watermark's existing staffing policies and procedures

21 preclude it from providing its residents with all the care and services they have been promised and

22 for which they are paying. In addition, Plaintiff seeks an order requiring Watermark to disclose to

23 prospective and current residents, their family members, and/or responsible parties that it does not

24 staff its assisted living facilities at a level to consistently provide the services it assesses its

25 residents as needing. Plaintiff further seeks an order prohibiting Watermark from charging fees

26 based on care points unless and until those points account for staff time sufficient to deliver to all

27 residents all the needed services specified in residents' assessments and Service Plans. In addition

28

CLASS ACTION COMPLAINT

to injunctive relief, this action seeks class wide damages based on Watermark's misrepresentations and misleading statements and material omissions alleged herein. This action does not seek recovery for personal injuries, emotional distress, or bodily harm that may have been caused by Watermark's conduct alleged herein.

## PARTIES

**Plaintiff**

14.     Plaintiff Joseph DeCarlo is a current resident of The Watermark at Westwood Village in Los Angeles, California, where he has resided since approximately November 30, 2021. At all times relevant to this Complaint, Mr. DeCarlo was an elder as defined under California Welfare & Institutions Code section 15610.27 and a senior citizen as defined under California Civil Code section 1761(f).  Mr. DeCarlo is and was at all times herein mentioned a resident of the State of California.  He brings this action on behalf of himself and all others similarly situated.

**Defendant**

15.     Headquartered in Tucson, Arizona, Watermark currently manages 58 communities in 21 states, including CCRCs, standalone independent living, assisted living, and memory care communities in addition to Medicare-certified rehabilitation and skilled nursing neighborhoods.

16.     Watermark Retirement Communities, LLC, is a Delaware limited liability company registered to do business in California, with its principal place of business in the state of Arizona. Watermark Retirement Communities, LLC is a licensee of The Watermark at Westwood Village, and currently operates, manages, and/or holds the licenses for approximately sixteen (16) assisted living facilities in California.

17.     Defendants Watermark Retirement Communities, LLC; and Does 1-100 will be referred to collectively as "Watermark" or "Defendants." Plaintiff is informed and believes, and accordingly alleges, that Defendants were responsible for all operational activities of the Watermark facilities in California at all times relevant to this action. Watermark's operations are centralized, hierarchical and standardized, and all of its assisted living facilities in California use the same uniform corporate policies, practices and procedures. These corporate policies, practices

and procedures control all aspects of the operations, staffing and staff training in its assisted living facilities. All of Watermark's assisted living facilities in California are required to follow the uniform policies, practices and procedures established by Defendants.  Watermark's unlawful conduct as alleged herein has been widespread, repeated, and consistent at each of its locations. The operations of Watermark's assisted living facilities in California are standardized. Watermark's conduct, as alleged herein, was and is part of a statewide plan, practice, course of conduct and scheme, and affects all the residents of Watermark's assisted living facilities.

18.     The true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants designated herein as Does 1 through 100, inclusive, are presently unknown to Plaintiff and thus sued by such fictitious names.  On information and belief, each of the Defendants designated herein as "Doe" is legally responsible for the events and actions alleged herein, and proximately caused or contributed to the injuries and damages as hereinafter described. Plaintiff will seek leave to amend this Complaint, in order to show the true names and capacities of such parties, when the same has been ascertained.

**JURISDICTION AND VENUE**

19.     This Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because Plaintiff and Defendant are residents and citizens of different states; the size of the proposed class of residents of Watermark's sixteen (16) California facilities is greater than 100 members; and the amount in controversy, based on damages in the form of initial fees and monthly charges estimated to be in the thousands of dollars per putative class member, exceeds $5,000,000 exclusive of interest and costs. Watermark is a Delaware limited liability company with its principal place of business in Arizona, making it a citizen of both Delaware and Arizona, and Plaintiff is a citizen of the State of California. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's pendent claims under California law.

20.     Defendant has sufficient minimum contacts in California or otherwise intentionally avails itself of the California market through ownership, licensure, and/or management currently of approximately sixteen (16) assisted living facilities located in California, derivation of

CLASS ACTION COMPLAINT

1  substantial revenues from California, and other activities, so as to render the exercise of

2  jurisdiction over Defendant by the California courts consistent with traditional notions of fair play

3  and substantial justice.

4       21.     Venue is proper in this District pursuant to 28 U.S.C. 1391(b), based on the

5  following facts:  Defendant conducts substantial business in this District, including but not limited

6  to the management and ownership of the Watermark at Westwood Village in the County of Los

7  Angeles; a portion of Defendants' liability arose in this District; and the acts upon which this

8  action is based occurred in part in this District.

9       **<u>GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS</u>**

10       22.     Watermark provides assisted living and memory care services for senior citizens

11  and persons with disabilities at facilities nationwide, including currently approximately sixteen

12  (16) facilities that it owns, operates, and/or licenses in California. Watermark's California

13  facilities are licensed by the California Department of Social Services ("DSS") as residential care

14  facilities for the elderly.

15       23.     Residential Care Facilities for the Elderly ("RCFEs"), are assisted living facilities

16  offering room, board, and daily assistance for seniors in certain activities of daily living ("ADLs"),

17  such as preparing meals, shopping, transportation, preparing and taking medication, housekeeping,

18  laundry, grooming, bathing, toileting, dressing, and others.

19       24.     Assisted living facilities are intended to provide a level of care appropriate for

20  those who are unable to live by themselves, but who do not have medical conditions requiring

21  more extensive nursing care and significant assistance with most of their ADLs.  Watermark's

22  assisted living facilities also have Memory Care units, which serve individuals with dementia and

23  other cognitive disorders.

24       25.     In addition to monthly rent, residents at Watermark facilities are charged for

25  standard services, which include staffing, utilities, dining including meals and snacks,

26  housekeeping and laundry, activities, transportation, parking, safety and fire protection,

27  maintenance, and routine health and wellness services. Watermark assesses each resident before

28

CLASS ACTION COMPLAINT

admission and then again periodically and/or whenever there is a change in the resident's condition.  By performing these assessments, Watermark determines what additional services a resident needs, such as assistance with ADLs, which are provided on a points system. Points are assigned to specific services and increase as the level of assistance to be provided increases. Watermark bills residents monthly for "care charges" on a per-point basis, as described in the Residency Agreement.

### Uniform Representations in Watermark's Standardized Contracts

26.     Watermark represents to residents, family members, and the general public that it will assess each resident's individual needs and determine which services, if any, would be necessary to meet those needs, as set forth in a Personalized Care Plan identifying the assessed services for which a resident will pay. Watermark's standardized assessment form indicates the amount (time) of the care services to be provided in "minutes per month." The resident assessment is used to determine the amount residents are charged, based on points, for the services and care that Watermark has determined is necessary.  Watermark makes these affirmative representations to each resident in its standardized contracts.

27.     Specifically, Section 4 of Watermark's standard Residency Agreement ("Residency Agreement"), represents that it will provide residents with living accommodations and standard services, which are included in the Standard Monthly Service Fee, such as:

- Staffing. Watermark shall provide twenty-four (24) hour staffing at the Community, and staff will conduct daily assurance checks on Your status;

- Dining: … Three meals per day for each day of the month are included in the Standard Monthly Service Fee … Snacks are available to You each day …;

- Housekeeping & Laundry: Watermark shall provide scheduled light housekeeping service every week … Daily tidying is also provided in the memory care program. Watermark shall provide weekly laundering of Your flat linens and personal items …;

- Activities: Watermark shall provide scheduled social, educational, cultural, recreational and spiritual activities …;

- Transportation: Watermark shall provide scheduled local transportation to Residents on a first come, first served basis …;

- Safety & Fire Protection: Watermark shall monitor the buildings and grounds at the

Community …;

- Maintenance: Watermark shall … provide necessary repairs, maintenance and replacement of Community property and equipment within Your apartment …;

- Health & Wellness: Watermark shall provide or make available routine health and wellness services, and will also make available access to dentistry, podiatry and other medical services … Watermark staff will observe Your health status to identify any change in Your physical, mental, emotional or social functioning and any health needs or special services You may require …

28.     The Resident Handbook, incorporated into the Residency Agreement by reference, states additionally:

Prior to your move-in, a licensed nurse will discuss with you your needs for health care and other supportive services and will prepare a Personalized Care Plan for you. Thereafter, every six months, or as needed, a licensed nurse, together with yourself, other health care practitioners and family members will assess your individual needs and determine which services would be most appropriate to meet your needs.

29.     At Section 4(l) of the Residency Agreement, Watermark represents that:

Watermark offers residents personal care services, which include but are not limited to supervision or assistance with bathing or showering; supervision or assistance with dressing and grooming; escorts to meals and activities; additional housekeeping and additional personal laundry service; assistance with toileting; psycho-social support; night checks; assistance in meeting Your routine/incidental medical and dental needs, including arranging transportation, if necessary, to medical or dental appointments, and other special services. Any service or combination of services as indicated as additional costs as defined in paragraph 6(c) can be found in Exhibit B.

30.     With regard to Watermark's memory care program, the Resident Handbook states further:

The Thrive Memory Program offers weekly and daily housekeeping and laundry service, three home-cooked meals daily, 24 hour associates, medication supervision and monitoring the activities of daily living.

31.     The Residency Agreement further provides at Exhibit B (Schedule of Additional Fees), for "Care Charges":

The Community offers personal care services, which may include but are not limited to; supervision or assistance with bathing or showering; supervision or assistance with dressing and grooming; escorts to meals and activities; additional housekeeping and personal laundry service; assistance with toileting; assistance with skin care; assitance with cognition; medication management; assistance with transfers and mobility; assurance checks; assistance in meeting routine/incidental medical and dental needs, including arranging for transportation, if necessary, to medical or dental appointments, diabetic care, coordination of hospice care, and incontinence care management. Points are based on a health care assessment and resident's personal needs.

| Assisted Living Points per Month | Monthly Cost per Point |
|---|---|
| 0 to 1,368 points<br><br>1,369+ points | Included in Monthly Service Fee<br><br>$0.56 per point over 1,368 points |
| Memory Care Points per Month | Monthly Cost per Point |
| 0 to 2,736 points<br><br>2,737+ points | Included in Memory Care Base Fee<br><br>$0.56 per point over 2,736 points |

32.     Watermark's assessment form shows each category of care for which Watermark offers services for a fee, such as functional, behavioral, and special medical needs. Each category contains within it specific, defined tasks detailing the level of assistance Watermark determines is required by the resident. Defined tasks include assistance with activities of daily living such as grooming, bathing, dressing, eating, toileting, mobility, and medications. Watermark allots each task in every category a specific number of "minutes per month." As more assistance is required, the average time of the specified task increases in concert with the corresponding number of assessed points. By way of example, the second-lowest level of assistance with grooming according to the Watermark assessment form consists of "reminders to perform grooming and hygiene tasks (e.g., shaving, washing face and hands, combing hair, oral care)."  Watermark allotted 183 "minutes per month" for this service. At the other end of the spectrum, Watermark allotted 1,825 minutes per month for "resists grooming and/or requires complete assistance / coaching / cueing with all grooming and hygiene tasks." Each resident's care point total is determined by summing the total number of "minutes" for all assessed services as reflected on his/her assessment form and the resident is billed according to the formula contained in Residency Agreement Exhibit B.

33.     Watermark does not disclose anywhere in the Residency Agreement or in any other manner that its resident assessment and staffing system lacks an essential and reasonably expected attribute – sufficient staffing capacity to provide residents with the care services they were assessed as needing and for which they pay.

CLASS ACTION COMPLAINT

34.    Together, the Residency Agreement and assessment form represent that Watermark has the capacity to provide the staffing sufficient in numbers to deliver the care services Watermark assessed residents as needing in the aggregate. Specifically, Watermark's assessment form sets forth the "minutes per month" Watermark has determined are necessary to provide to residents the tasks it assessed them as needing. Thus, the assessment form indicates how each resident need will be met by staff. For example, under the category "Bathing," Watermark represents that it allots to a resident 650 minutes per month for a resident requiring "associate assistance with showers 3-5 times weekly." This statement underlines the obvious—care can only be provided by staff, and a resident who has additional care needs requires additional staff time in order to meet such needs.  The promise of additional staff time is what allows Watermark to charge these residents more based on the increased number of points that are assigned to the residents.

35.    Because these representations are presented through form contracts and other standardized corporate materials, potential and current residents of Watermark facilities reasonably understand them to be representations of the policies and procedures followed by Watermark both for determining the needs of facility residents and for allocating the resources necessary to ensure that there are sufficient numbers of trained staff in Watermark's California facilities to meet those needs.

36.    Based on these representations, Plaintiff, the putative class members, and the general consuming public reasonably expect that Watermark will provide sufficient numbers of caregiver staff at its California facilities to provide on a consistent basis the services Watermark has assessed its residents as needing and for which they are paying Watermark money.

**Watermark's Non-Disclosure and Concealment**

37.    Contrary to the representations in the Watermark standardized contract and other uniform written statements, Watermark lacks an essential and reasonably expected attribute, namely sufficient staffing capacity to provide residents with the care services they were assessed

CLASS ACTION COMPLAINT

as needing and for which they paid. Watermark does not disclose this material fact from the residents, their family members, and the general public.

38.    Plaintiff is informed and believes, and on that basis alleges, that Watermark has the capability to determine, to the minute, the number of staff required to meet the aggregate services promised to residents, either as a whole or on any given shift, based on the evaluated needs and assessed points of residents, and including the task times and frequencies estimated by Watermark as being necessary to deliver promised services.  While Watermark uses this resident assessment system to set and charge monthly rates, Watermark's staffing policies and procedures are deficient in that they fail to ensure that Watermark facilities have the staffing capacity to provide residents with assessed services on a consistent basis.

39.    As a result of Watermark's policy and practice of understaffing as described herein, residents of Watermark's California facilities do not receive the services Watermark promised and for which they paid. As a result, residents regularly suffer frustration, pain, discomfort, humiliation, and/or injury from inadequate care and supervision.

40.    The consequences of Watermark's policy and practice of understaffing as set forth herein are significant. They include, but are not limited to: resident falls and injuries, injuries left untreated, unexplained injuries, elopements (or wandering from the facility), slow or no responses to resident call buttons, failures to assist with toileting resulting in incontinence, inconsistent incontinence care resulting in residents sitting in soiled and/or wet briefs for long periods of time, urinary tract infections, dehydration, residents assaulting other residents, medication errors, and inadequate grooming and hygiene assistance.

### The Misrepresented and Concealed Facts Are Material

41.    Watermark's misrepresentations and the facts it does not disclose are material to the reasonable consumer.  An important and significant factor in choosing to move oneself or one's relative to a Watermark facility is the provision of staffing that Watermark itself has determined is necessary to meet the assessed needs of all facility residents.

42.     Watermark knows that prospective residents consider the availability of trained staff sufficient to address each resident's needs when choosing an assisted living facility. Watermark's website describes its assisted living offering, promising "24/7" coverage by "expert associates" who provide "care and services tailored to meet [a resident's] needs and preferences" and allow residents and their loved ones "to enjoy peace of mind that comes with knowing [] needs will be met even as they change, in a safe and welcoming setting." (*See, e.g.,* https://www.watermarkcommunities.com/living-choices/assisted-living/, last visited on February 24, 2023). Watermark's memory care offering similarly promises "integrated wellness programs and curated activities to meet [memory care residents'] unique needs" through staff who "provide personalized care and one-on-one support 24/7." (*See, e.g.,* https://www.watermarkcommunities.com/living-choices/memory-care/; https://www.watermarkcommunities.com/why-watermark/signature-programs/thrive-memory-care/, last visited on February 24, 2023).

43.     Watermark's promise to provide the care services (through facility staff) that each resident requires as determined by Watermark's resident assessment system is material to prospective residents and their family members. Further, residents (and their family members) reasonably expect that Watermark will provide the overall number of trained staff sufficient to meet all the assessed needs of all facility residents. The availability of trained staff sufficient to provide the care necessary to meet assessed resident needs is a substantial factor in deciding to enter an assisted living facility. Mr. DeCarlo would not have agreed to move into a Watermark facility if he had known that, although Watermark would charge him a one-time Membership Fee in connection with, *inter alia*, Watermark's assessment of his needs and development of his individual care plan, he would not in fact receive the services Watermark assessed him as needing and for which he paid because Watermark lacked an essential and reasonably expected attribute, namely the staffing capacity to provide assessed services. Likewise, members of the putative class would in all reasonable probability not have entered Watermark's facilities if they had known that Watermark's policies and procedures regarding staffing are deficient and are not reasonably

designed to provide residents on a consistent basis with the services that the residents were determined to need through Watermark's assessment system.

44.    A key factor for these residents in selecting Watermark is the reasonable expectation that the assistance and care Watermark determines they require through the resident assessment process will be provided on a consistent basis, both now and as those needs, and corresponding care services fees, increase as the residents age.

45.    Watermark has a duty to disclose to the consuming public that its California assisted living facilities lack the staffing capacity to provide residents with assessed services on a consistent basis because, among other reasons, of the inherent and substantial safety risk to current and future residents from Watermark's conduct, particularly as Watermark serves a vulnerable population that needs assistance.  The non-disclosure is material because Watermark knows that its conduct risks the safety of its residents.  Yet, Watermark has failed to disclose and actively conceals from residents, prospective residents, and their family members the true facts about its corporate policy and practice of understaffing at its California facilities.

**Barriers to Moving Out**

46.    Watermark's misrepresentations and omissions affect not only the decision of residents to enter a Watermark facility, but also the decision to stay there.

47.    In choosing assisted living in general and a Watermark facility in particular, the resident forgoes other options such as his or her former home, a senior community, or other facilities where the resident can try to build a new community.  Once in a facility, there are significant financial, physical, emotional, and other burdens for the residents that are triggered if they terminate a residency, including impacts such as "transfer trauma", which is recognized as the negative health effects on elderly or disabled persons resulting from relocating, such as a decline in physical, mental, behavioral, and functional well-being. Watermark is aware of these burdens, and makes the representations and/or otherwise fails to disclose the information described herein with the knowledge that it will be difficult for residents to leave its facilities once they are enticed to enter based on its misrepresentations (and failures to disclose).

CLASS ACTION COMPLAINT

**Named Plaintiff's Experiences at Watermark**

48.    Joseph DeCarlo ("Mr. DeCarlo"), a 70 year old elder who is a current resident in the assisted living unit at The Watermark at Westwood Village in Los Angeles, California since approximately November 30, 2021. Mr. DeCarlo relied on Watermark's representations in choosing the facility over others he considered. Watermark provided Mr. DeCarlo with a Residency Agreement pursuant to which it promised to provide certain core services in exchange for a standard monthly rate ("Standard Monthly Service Fee"). Mr. DeCarlo read the Residency Agreement before he moved into The Watermark at Westwood.  The core services offered by Watermark included the provision of 24-hour staffing and daily assurance checks, utilities, dining including three meals per day and snacks, housekeeping and laundry, activities, transportation, parking, safety and fire protection, maintenance, and the provision of routine health and wellness services.

49.    Additionally, the Resident Handbook, which the Residency Agreement incorporated by reference, noted Watermark's offering to residents of:

> [A] full range of personal care services as part of its Assisted Living program. This program includes preventative health and wellness services through the Health and Wellness Services Program, supportive and restorative services, 24-hour personal care and oversight; all under the supervision of a licensed professional nurse.

The Resident Handbook further provided:

> Prior to your move-in, a licensed nurse will discuss with you your needs for health care and other supportive services and will prepare a Personalized Care Plan for you. Thereafter, every six months, or as needed, a licensed nurse, together with yourself, other health care practitioners and family members will assess your individual needs and determine which services would be most appropriate to meet your needs …

50.    The Residency Agreement explains at paragraphs 4(l) and 6(c), and Exhibits A and B, that residents will be charged a separate fee for the provision of care services.

a.    Specifically, paragraph 4(l) states in pertinent part:

> Any service or combination of services as indicated as additional costs as defined in paragraph 6(c) can be found in **Exhibit B.**

b.    Paragraph 6(c) states in pertinent part:

**Other Charges.** Additional, optional services provided by or in the Community, and current charges therefore, are described in the body of this Agreement, the Resident Handbook or **Exhibits A and B.**

…

(ii) If your need for personal care or assistance increases or decreases, charges are subject to immediate change by Watermark based on the care You need. Written notice will be provided to You and Your Responsible Party, if any, within two business days of providing services that result in a rate increase. The notice will include a detailed explanation of the additional services provided and will itemize the charges.

c. Exhibit A is titled "Schedule of Fees" for Assisted Living and Memory Care residents. The fees described in Exhibit A included: Membership Fee, Standard Monthly Service Fee, and "Care Charges (Monthly), Points."

d. Exhibit B is titled "Schedule of Additional Fees" for Assisted Living and Memory Care residents. After describing the personal care services offered by Watermark and for which it assessed "Care Charges," Exhibit B states in pertinent part:

Points are based on a health care assessment and resident's personal needs.

51. As stated in the Care Charges section of Exhibit B, the charges commensurate with the first 1,368 points assessed by Watermark for required services are included in a resident's Monthly Service Fee. Thereafter, additional points are charged at a rate of $0.56 per point over 1,368 points for Assisted Living residents, and at a rate of $0.56 per point over 2,736 points for Memory Care residents.

52. In the section titled "Members Rights and Responsibilities," Watermark's Resident Handbook incorporates and summarizes the Resident Bill of Rights specified in California's Title 22, Section 87572. In pertinent part, Watermark affirmed the rights of residents at its California facilities "[t]o care, supervision, and services that meet their individual needs, and are delivered by staff that are sufficient in numbers, qualifications, and competency to meet their needs."

53. Mr. DeCarlo reasonably understood Watermark's representations in the Residency Agreement mean that Watermark would perform an assessment of him, assign him a certain number of points based on the services he required, and charge him fees based on the number of points assessed. He reasonably expected that Watermark staff would provide the services identified as necessary in his assessment, and that his points and related charges would increase or decrease as his needs changed and he required more or fewer services from staff. He expected that Watermark would sufficiently staff the facility to provide the services for which he would be

17

charged.  Mr. DeCarlo relied on the representations in the contract in deciding to reside at The Watermark at Westwood Village.

54.    Watermark's initial evaluation of Mr. DeCarlo resulted in the assessment of 8,105 points. According to Watermark's Residency Agreement, the assessed points equal approximately 135 hours of staff time per month, inclusive of the 23 hours of staff time per month included in the Standard Monthly Service Fee, amounting to approximately 4 ½ hours per day of staff time Watermark promised to provide to Mr. DeCarlo.

55.    Watermark determined in its initial assessment of Mr. DeCarlo that he required the following assistance: stand-by assistance with grooming; assistance with bathing 6-7 times weekly; assistance with dressing and undressing; assistance to/from bathroom; assistance with transferring; escorting and stand-by physical assistance to attend meals and daily events; medication management with five to eight medications and three or less passes; fall reduction program; 5-6 day/night assurance checks; associate assistance/mechanical device for eating, ambulating, or grooming/hygiene; reminders, prompting and physical assistance to comply with community emergency procedures; joint limitations requiring staff monitoring and assistance; fragile skin requiring occasional skin checks; pain management needs requiring staff observation/monitoring and assistance; and nursing assessment less than 1x/week.

56.    Upon receiving his initial assessment, Mr. DeCarlo and his son questioned the management at Westwood Village about the evaluation and questioned how they determined Mr. DeCarlo required more than four hours of care per day for the assistance identified on the assessment. Nevertheless, Mr. DeCarlo agreed to pay the assessed amount, with the understanding that if his needs were not actually as assessed, he and Watermark would revisit the assessment and adjust accordingly. To that end, Mr. DeCarlo paid his first month of care fees and requested of Watermark a log of the services it was to provide to Mr. DeCarlo based on his initial assessment, and Watermark agreed to provide same.

57.    Mr. DeCarlo paid a one-time Membership Fee of $15,000 when he signed the Residency Agreement to move into the Watermark at Westwood Village. Upon moving into The

CLASS ACTION COMPLAINT

Watermark at Westwood Village, Mr. DeCarlo paid Watermark $10,195 for his initial Standard Monthly Service Fee and $3,006.64 in initial monthly Care Charges, the latter which equates to 5,369 total points.

58.    After not receiving any of the services Watermark assessed him as needing prior to his move-in, Mr. DeCarlo's son requested that Watermark provide the log of services purportedly rendered to his father, consistent with their previous agreement. At no time has either Mr. DeCarlo or his family received satisfactory information indicating that Watermark has provided the services it promised to provide to Mr. DeCarlo in exchange for his Membership Fee.

59.    Watermark did not adjust Mr. DeCarlo's assessment and Service Plan until approximately March 2022, when it reduced his point total to 2,935, amounting to an approximately 50% reduction of total time Watermark promised to provide Mr. DeCarlo for the assistance it assessed him as needing and charged him for, including: medication management with five to eight medications and three or less passes; fall reduction program; additional associate assistance and observation to maintain clean home environment 1x/week; resident uses behavioral medications; joint limitations that do not limit functioning; staff observation/monitoring and assistance with daily pain management needs. Nevertheless, Mr. DeCarlo did not receive the services Watermark promised to provide in exchange for the Membership Fee Mr. DeCarlo paid in reliance thereon.

60.    Watermark assessed Mr. DeCarlo again on or about October 23, 2022. The October re-assessment totaled 2,853 points and covered the same assistance as the March 2022 assessment save for the 83 minutes (monthly) of assistance associated with Mr. DeCarlo's use of behavior medications. The October 2022 reassessment notwithstanding, Watermark's failure to provide the assessed services to Mr. DeCarlo remains ongoing.

61.    Watermark promised to institute a fall management program to assist with Mr. DeCarlo's stability. In providing this service, Watermark promised to "use every measure available consistently" and purported to allot 1,251 minutes monthly (or about 42 minutes daily) to do so. During his residency at The Watermark at Westwood Village, Mr. DeCarlo never has

CLASS ACTION COMPLAINT

received this type of assistance from Watermark staff. He has experienced several falls during that time, at least two of which required hospitalization.

62.    Watermark also has promised to observe and/or monitor Mr. DeCarlo given his daily pain management needs and has purported to allot 426 minutes monthly (or about 15 minutes daily) to do so. Watermark also promised to provide additional housekeeping to Mr. DeCarlo on a weekly basis for about half-an-hour (or 130 minutes/month). Since residing at The Watermark of Westwood Village, Watermark has provided neither the monitoring nor the additional housekeeping services it promised to provide.

63.    The problems Plaintiff has experienced at Watermark are typical. Publicly available Facility Evaluation and Complaint Investigation reports issued by the Continuing Care Licensing Division of California's Department of Social Services (hereinafter "Community Care Licensing") also evidence Defendants' understaffing policy in practice, as well as the bad outcomes that can result.

64.    For example, the facility where Plaintiff resides, The Watermark at Westwood Village, was cited by Community Care Licensing in February 2022 for violating Title 22 for "fail[ing] to ensure there were sufficient staff to meet the needs of residents in memory care and assisted living" which "poses a potential health and safety risk." When interviewed in connection with the investigation, the facility's Executive Director "confirmed" the staffing shortage. So too did various staff and residents who also were interviewed by Community Care Licensing. For example, one staff person stated: "It's a struggle right now. We are so short staff. We are filling in all the shifts we can." Another staff person responded to an investigator: "[N]o, especially for memory care. There is usually only one person on. It should be at least 2 staff in memory care, but it's only one. Sometimes there's only like 2 staff for the entire building on Friday and Saturday." Yet another stated succinctly, "No, we need more staff for sure. There is not enough staff to help with all the residents." Community Care Licensing also cited Westwood Village for failing to ensure there was sufficient coverage for administering medication at all times and to respond to pendants in connection with the same complaint investigation. As one staff person told an

CLASS ACTION COMPLAINT

investigator: "[C]orrect, when there is no coverage or short staff no one is answering the pendants. That's what happened on Sunday."

65.     Other Watermark assisted living facilities also were cited for Title 22 violations that are indicative of an insufficient number of staff available to meet residents assessed needs. For example, Community Care Licensing cited The Watermark at Napa Valley in August 2021 for failing to respond to residents' call buttons in a timely manner. More specifically, in a roughly three-month period in 2021, the facility's call button response time report indicated 66 response times between 30-60 minutes and at least 19 response times that were more than 60 minutes. Napa Valley also was cited for insufficient staffing resulting in a resident leaving the facility at the same time.

66.     Watermark facilities at Fremont Hills, Lakeside Park, and Rosewood Gardens similarly were cited by Community Care Licensing for failing to supervise residents and/or preventing residents from leaving the facility unassisted. An October 2022 citation issued to The Watermark by the Bay for the same violation illustrates the bad outcomes that can result from understaffing, insofar as the staff's failure to respond timely to the egress door alarm allowed the resident to exit to a stairway which resulted in injury.

## CLASS ALLEGATIONS

67.     The named Plaintiff brings this action as a class action pursuant to Fed. R. Civ. Proc. 23(b)(3) as set forth below.

68.     **Class Definition.**  This action is brought on behalf of the named Plaintiff and all similarly situated persons, and/or the successors-in-interest to the estates of similarly situated persons, who resided or reside at one of the California assisted living facilities owned and/or operated by Watermark from March 6, 2019 through the present (the "Class Period"), and who contracted with Watermark for services for which Watermark was paid money, and who are not subject to the arbitration agreement contained in the resident's Residency Agreement.

69.     Excluded from the above-referenced class are the officers, directors, and employees of Defendants, and any of Defendants' shareholders or other persons who hold a financial interest

in Defendants.  Also excluded is any judge assigned to hear this case (or any spouse or family member of any assigned judge), or any juror selected to hear this case.

70.    This action is brought as a class action and may properly be so maintained pursuant to Fed. R. Civ. Proc. 23(b)(3) and applicable case law.  In addition to injunctive relief, this action seeks class wide damages based on Defendants' misrepresentations and misleading statements and material omissions alleged herein.  This action does not seek recovery for personal injuries, emotional distress, or bodily harm that may have been caused by Defendants' conduct alleged herein.

71.    **Ascertainability.** Members of the proposed Class are identifiable and ascertainable. Watermark retains admission contracts, resident assessments and service plans, and billing statements for all persons who currently reside or resided at Watermark facilities during the class period.

72.    **Impracticability of Joinder (Numerosity of the Class).**  Members of the class are so numerous that their individual joinder herein is impracticable.  The precise number of members of the class and their addresses are presently unknown to Plaintiff.  Defendants currently own and/or operates approximately sixteen (16) assisted living facilities in California.  The number of residents at those facilities during the class period likely exceeds 2,000 individuals.  The precise number of persons in the class and their identities and addresses may be ascertained from Defendants' records.

73.    **Questions of Fact and Law Common to the Class.**  Numerous important common questions of law and fact exist as to all members of the class and predominate over the questions affecting only individual members of the class.  These common legal and factual questions include without limitation:

(a)  whether Defendants have violated and continue to violate the Consumer Legal Remedies Act, California Civil Code section 1770 *et seq.,* ("the CLRA") by falsely representing that Watermark will provide care services to residents based on an assessment of each resident's when Watermark does not provide the staffing necessary to deliver such services;

(b)      whether Defendants have violated and continue to violate the CLRA by promising residents that they will provide care and services even though Defendants know that their policies and procedures regarding staffing do not ensure that there are sufficient numbers of staff to deliver the care and services determined by the resident assessment system, such that Watermark is precluded from consistently providing residents with all the care they have been promised and for which they paid;

(c)      whether Defendants' misrepresentations, misleading statements, and omissions regarding the lack of an essential and reasonably expected attribute of Watermark's resident assessment system and its policies and procedures regarding staffing are material to the reasonable consumer;

(d)      whether a reasonable consumer would be likely to be deceived by Defendants' misrepresentations, misleading statements, or material omissions;

(e)      whether by making the misrepresentations, misleading statements, and material omissions alleged in this Complaint, Defendants have violated and continue to violate the CLRA;

(f)      whether by making the misrepresentations, misleading statements, and material omissions alleged in this Complaint, Defendants violated and continue to violate California Business & Professions Code sections 17200, *et seq.* ("UCL");

(g)      whether Defendants had exclusive knowledge of material facts not known or reasonably accessible to the Plaintiff and the class;

(h)      whether the Plaintiff, the class, and the consuming public were likely to be deceived by the foregoing concealment and material omissions;

(i)      whether the Plaintiff, the class, and the consuming public have a reasonable expectation that Defendants will employ a resident assessment system and policies and procedures regarding staffing that are capable of providing residents with the amount and type of care that Watermark has determined to be necessary to them and for which they pay money;

CLASS ACTION COMPLAINT

1      (j)      whether Defendants' misrepresentations, misleading statements, failures to

2  disclose, and concealment of its true policies, procedures, and practices regarding how its staffs its

3  facilities violated the CLRA and the UCL;

4      (k)      whether Defendants have engaged and continue to engage in a pattern and

5  practice of unfair and deceptive conduct in connection with the management, administration and

6  operation of its California assisted living and memory care facilities;

7      (l)      whether Defendants have violated and continue to violate the UCL by

8  violating the CLRA and California W&I Code section 15610.30 during the class period;

9      (m)      whether Defendants have committed financial elder abuse under California

10  W&I Code section 15610.30 by taking, secreting, appropriating, obtaining and/or retaining money

11  from elders and dependent adults for a wrongful use and/or with the intent to defraud them;

12      (n)      whether Plaintiff and the members of the class have sustained injury;

13      (o)      whether Plaintiff and the members of the class are entitled to damages, and

14  the nature of such damages; and,

15      (p)      whether Plaintiff and the members of the class are entitled to restitution,

16  declaratory and injunctive relief and/or other relief, and the nature of such relief.

17      74.   **Typicality.**   The claims of Plaintiff are typical of the claims of the class.  As

18  alleged above, Defendants misrepresented to Plaintiff and the class members and/or their family

19  members that each resident will be provided the care services (through facility staff) that the

20  resident needs as determined by Watermark's resident assessment system and the corresponding

21  care points generated, without being told that Watermark lacks  an essential and reasonably

22  expected attribute – sufficient staffing  to provide residents with the care services they were

23  assessed as needing. Defendants' common policy and practice of understaffing results in

24  Watermark's inability to provide on a consistent basis all the services and care residents are

25  assessed as needing and for which they paid. Further, as alleged above, Defendants have failed to

26  disclose and concealed this material fact from Plaintiff and the members of the proposed class.

27  Plaintiff's claims are typical of the claims of the proposed class in the following ways:  1) Plaintiff

28

CLASS ACTION COMPLAINT

is a member of the proposed class; 2) Plaintiff's claims arise from the same uniform corporate policies, procedures, practices, and course of conduct on the part of Defendants; 3) Plaintiff's claims are based on the same legal and remedial theories as those of the proposed class and involve similar factual circumstances; 4) the injuries suffered by Plaintiff are similar to the injuries suffered by the proposed class members; and 5) Plaintiff seeks a common form of relief for himself and the members of the class.

75.    **Adequacy.**  Plaintiff is an adequate representative of the class on whose behalf this action is prosecuted.  His interests do not conflict with the interests of the class.  Also, he has retained competent counsel with extensive experience in class action and senior care litigation who will prosecute this action vigorously.

76.    **Predominance.**  Certification of Plaintiff's claims under the CLRA, the UCL, and the Elder Abuse Act is appropriate because questions of law or fact common to class members predominate over any questions affecting only individual members of the proposed class.

77.    **Superiority.**  A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

(a)    individual claims by the class members would be impracticable because the costs of pursuing such claims would far exceed what any individual class member has at stake;

(b)    relatively little individual litigation has been commenced over the controversies alleged in this Complaint, and individual class members are unlikely to have an interest in separately prosecuting and controlling individual actions;

(c)    the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy;

(d)    the proposed class is manageable, and no difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action;

(e)    the proposed class members are readily identifiable from Defendants' own records; and

(f)      prosecution of separate actions by individual members of the proposed class would create the risk of inconsistent or varying adjudications with respect to individual members of the proposed class that would establish incompatible standards of conduct for Defendants.

78.      Without a class action, Defendants will likely retain the benefit of its wrongdoing and will continue in its illegal course of conduct which will result in further damages to Plaintiff and the proposed class.

**FIRST CLAIM FOR RELIEF**

**CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (Cal. Civ. Code § 1750 _et seq._)**

79.      Plaintiff refers to, and incorporates herein by reference, all preceding paragraphs.

80.      Plaintiff and the class members are "senior citizens" and/or "disabled persons" as defined in California Civil Code section 1761(f) and (g).  They are also "consumers" as defined in California Civil Code section 1761(d).

81.      Watermark is a "person" as defined under California Civil Code section 1761(c).  The assisted living and memory care services provided by Watermark constitute "services" under California Civil Code section 1761(b).  The agreement by Plaintiff and the putative class members to provide one-time Membership Fees and monthly payments to Watermark in exchange for assisted living and memory care services constitutes a "transaction" under California Civil Code section 1761(e).

82.      In its uniform resident contracts, Resident Handbook, and assessment form presented to prospective residents and their family members, Watermark represented and continues to represent that Watermark will provide care services (through its facility staff) that are sufficient to meet the needs of each resident, as determined by Watermark's resident assessment system and confirmed in the care points assigned to each resident as set forth on Watermark's assessment form. That same representation is made in Watermark's re-assessments of residents and other standardized corporate materials.  As alleged herein, these uniform corporate representations are false and misleading, and are likely to deceive the reasonable consumer.

CLASS ACTION COMPLAINT

83.    Contrary to Watermark's uniform misrepresentations and misleading statements and omissions, it does not staff its facilities at a level to consistently provide the services that it assessed its residents as needing through its resident assessment system.  Watermark's assisted living facilities lack an essential and reasonably expected attribute – sufficient staffing capacity to provide residents with the care services they were assessed as needing. As a result of Watermark's corporate policy and practice of understaffing, Watermark's facilities are not adequately staffed to meet the assessed care needs of the residents. Watermark does not disclose and actively conceals this policy and practice of understaffing from current and prospective residents and their family members.

84.    The named Plaintiff and the putative class members considered material Watermark's promise to provide care services (through its facility staff) that would be sufficient to meet the needs of each resident. If the named Plaintiff had known the true facts, he would not have agreed to reside in a Watermark facility, or would have insisted on paying less money to Watermark.  If the putative class members had known the true facts, they would in all reasonable probability not have agreed to enter Watermark, or would have insisted on paying less money to Watermark.

85.    The facts that Watermark misrepresents, fails to disclose, and actively conceals are material and are likely to deceive the reasonable consumer.  Consumers choose an assisted living facility because they need care and/or wish to age in place as their care needs change.  Residents and their family members consider the overall staffing levels provided by the assisted living facility they select to be of great importance. A staffing system or policy that lacks an essential and reasonably expected attribute – staffing capacity to provide assessed services – will not provide required services to residents on a consistent and reliable basis. It is therefore a matter of fundamental importance to the reasonable consumer, in choosing and staying at Watermark, to know that it does not staff its assisted living facilities at a level to consistently provide the care services it assesses its residents as needing and for which they are charged monthly fees on an ongoing basis.

CLASS ACTION COMPLAINT

86.    Residents and their family members would consider material Watermark's uniform corporate policy and practice of understaffing as alleged herein.  Plaintiff and the putative class members could not reasonably have been expected to learn or discover these non-disclosed facts, and in fact, Watermark affirmatively concealed them.

87.    Watermark has violated and continues to violate the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq*., in at least the following respects: (a) in violation of section 1770(a)(5), Watermark has misrepresented, failed to disclose and concealed the true characteristics and/or quantities of services provided at its California facilities; (b) in violation of section 1770(a)(7), Watermark has misrepresented, failed to disclose and concealed the true standard, quality and/or grade of services provided at its California facilities; (c) in violation of section 1770(a)(9), Watermark has falsely advertised that it will provide staffing based on resident appraisals and the care points generated by those appraisals, knowing that it does not intend to provide the services as advertised; and (d) in violation of section 1770(a)(14), Watermark has represented that the agreement signed by residents and/or their representatives, and under which they pay their monthly rate, confers on residents the right to reside in a facility that provides staffing sufficient to meet residents' assessed needs when in fact, Watermark does not staff its facilities at a level to consistently provide the services it assessed its residents need in the aggregate.

88.    These misrepresentations, misleading statements, acts, practices, and omissions by Watermark are and were intended to induce and lure elderly and dependent adult residents and their family members into agreeing to be admitted to Watermark's facilities and to pay new resident services fees, including without limitation Membership Fees, based on Watermark's resident assessment system and assessed care points.

89.    Watermark made the written misrepresentations and misleading statements alleged herein through uniform means of communication, including without limitation, the Residency Agreement, the Resident Handbook, the assessment form, subsequent agreements based on re-assessments of the resident, resident service plans, and other written corporate materials

disseminated to the public in connection with Watermark's services. These representations were made directly to the named Plaintiff, putative class members and their family members and/or representatives by Watermark in its standard resident admission contract and reinforced by the uniform means of communication listed above.

90.    In addition to its affirmative misrepresentations, Watermark failed to disclose and concealed from Plaintiff, the putative class members, and their family members that its policies and procedures regarding staffing are defective and are not reasonably designed to ensure that Watermark's facilities have sufficient staff to deliver the services identified in the residents' assessments.

91.    Watermark had exclusive and superior knowledge of material facts not known to the named Plaintiff, class members or the general public at the time of the subject transactions and actively concealed these material facts.

92.    Watermark had exclusive and superior knowledge of its corporate policy and practice of understaffing. Further, Plaintiff alleges on information and belief that Watermark's officers, directors, and managers were repeatedly advised by their own staff that Watermark facilities were not adequately staffed to meet resident needs. Watermark also knew that its failure to provide staffing sufficient to meet the assessed needs of its residents posed a substantial health and safety risk to the named Plaintiff and class members. Watermark intentionally concealed, suppressed and/or failed to disclose the true facts with the intent to defraud the named Plaintiff and putative class members. The named Plaintiff and the putative class members did not know these material undisclosed facts and could not reasonably have been expected to discover them.

93.    As a direct and proximate result of the Watermark's conduct, Plaintiff and the putative class members suffered actual damages. Specifically, Plaintiff and the class members paid money to Defendant, in the form of the new resident fee (called a "Membership Fee"), their initial monthly fees, and additional monthly fees, paid in exchange for residency and services in a facility that was falsely represented to be staffed to meet the residents' assessed needs as determined by Watermark's resident assessment system. Plaintiff and the class members paid a

CLASS ACTION COMPLAINT

premium for the misrepresented services, and would not have entered Watermark's facilities and made payments to Watermark had they known the truth about Watermark's policies and practices for staffing its assisted living facilities.

94. As a further direct and proximate result of Watermark's failure to staff its facilities as represented, Plaintiff and the class members have been forced to reside in facilities that have less staff than necessary to satisfy their care needs, as determined by Watermark itself. As a result of Watermark's policy and practice of understaffing, it is not possible for Watermark to meet the assessed needs of its residents, and it is substantially certain that residents will not receive the service Watermark has promised to provide in exchange for the Membership Fee and subsequent monthly service fees – namely the care Watermark has determined is necessary and promised to provide. Plaintiff and the class members also face the substantial risk that they will suffer physical injuries from such lack of care and / or from other residents who are insufficiently supervised or cared for.

95. Plaintiff sent Watermark a notice to cure under California Civil Code § 1782(a), on March 6, 2023. If Watermark does not reply to the notice or correct or remedy the violations alleged in the notice and herein within 30 days after receipt, Plaintiff and the class members will be entitled to seek actual damages, statutory damages, restitution, punitive damages, and other monetary relief in an amount to be proven at trial, and Plaintiff will amend this Complaint accordingly.

96. Plaintiff and all class members are also entitled to not less than $1,000 in statutory damages pursuant to California Civil Code § 1780(a). Further, Plaintiff and other class members are also each entitled to statutory damages of up to $5,000 pursuant to California Civil Code § 1780(b). Plaintiff and many other class members are seniors and/or disabled persons as defined by California Civil Code § 1761(f) and (g) and have sustained substantial economic harm as a result of Watermark's conduct. Watermark knew that its conduct negatively impacted seniors and disabled persons.

CLASS ACTION COMPLAINT

97.     Plaintiff will additionally seek treble damages under California Civil Code § 3345, punitive damages, reasonable attorneys' fees and costs, and all other relief the Court deems just and proper. Excluded from Plaintiff's request are damages related to any personal injuries, emotional distress or wrongful death suffered by any member of the class.

98.     Watermark's conduct presents a continuing threat of substantial harm to the public in that, among other things, Watermark continues to misrepresent that each resident will be provided the care services (through facility staff) that the resident needs as determined by Watermark's resident assessment system and corresponding care points generated. Despite the knowledge that Watermark's policies and procedures regarding staffing are deficient and do not ensure that its facilities have staffing capacity that is sufficient to provide residents with the amount and type of care that Watermark has determined to be necessary, Watermark continues to induce elderly and vulnerable citizens to enter its facilities. Additionally, the risk of harm to the class members from Watermark's conduct is substantial.  Accordingly, Plaintiff seeks an injunction that requires that Watermark immediately cease the CLRA violations alleged herein, and to enjoin it from continuing to engage in any such acts or practices in the future.  Specifically, Plaintiff seek an injunction requiring Watermark to disclose to Plaintiff, the putative class members and the consuming public that Watermark does not staff its assisted living facilities at a level to consistently provide the services it assesses its residents as needing. Plaintiff further seeks an injunction requiring Watermark to disclose to prospective and current residents, their family members or responsible parties, and the putative class that Watermark's existing staffing policies and procedures preclude it from providing its residents with all the care and services they have been promised and are paying for.

## SECOND CLAIM FOR RELIEF

## UNLAWFUL, UNFAIR AND DECEPTIVE BUSINESS PRACTICES (Cal. B&P Code § 17200 *et seq.*)

99.     Plaintiff refers to, and incorporates herein by this reference, all preceding paragraphs.

100.    Watermark has engaged in unlawful business acts and practices.  Such acts and practices constitute unfair business practices in violation of California Business and Professions Code § 17200, *et seq.*

101.    In particular, Watermark has engaged in unlawful business acts and practices by violating numerous laws, statutes and regulations including, without limitation:

(a)    Systematically and uniformly representing to the residents of its assisted living facilities in California, family members and the public that each resident will be provided the care services (through facility staff) that the resident needs as determined by Watermark's resident assessment system and corresponding care points generated when Watermark does not staff its facilities at a level to consistently provide assessed services because Watermark's policies and procedures regarding staffing are deficient and do not ensure that it has  sufficient staffing capacity to provide residents with the care services they were assessed as needing,  in violation of California Business & Professions Code § 17500, *et seq.* and California Civil Code § 1770, *et seq.*; and

(b)    Taking, secreting, appropriating, obtaining, and retaining the funds of elders and dependent adults for a wrongful use and/or with the intent to defraud in violation of California W&I Code § 15610.30.

102.    By virtue of the conduct alleged herein, Watermark has also engaged in fraudulent business practices. Members of the general public (including without limitation persons admitted to and/or residing in Watermark's California assisted living and memory care facilities during the Class Period, and their family members and/or representatives) have been and are likely to be deceived by Watermark's false and misleading statements and failures to disclose as alleged herein.

103.    The acts and practices of Watermark also constitute unfair business acts and practices within the meaning of California Business & Professions Code § 17200, *et seq.,* in that the conduct alleged herein is immoral, unscrupulous and contrary to public policy, and the detriment and gravity of that conduct outweighs any benefits attributable to such conduct.

104.    Watermark's misrepresentations, misleading statements, acts, practices, and material omissions were intended to induce and lure elderly and dependent adult residents and their family members into agreeing to be admitted to Watermark's facilities and to pay a one-time Membership Fee and monthly rates to live in an assisted living facility that provides staffing sufficient to meet residents' needs.

105.    Watermark made these misrepresentations and misleading statements and omissions through various uniform means of written corporate communications, including without limitation, the Residency Agreement, the Resident Handbook, the assessment form, resident care plans, and other materials disseminated to the public from its corporate headquarters in connection with Watermark's services.  These representations were made directly to the named Plaintiff, class members and their family members and/or representatives by Watermark in its standard resident contracts and reinforced by the uniform means of communication listed above.

106.    In addition to its affirmative misrepresentations that Watermark will provide each resident with the care services (through facility staff) that the resident needs as determined by Watermark's resident assessment system and corresponding care points generated, Watermark concealed from Plaintiff, the putative class members, and their family members that Watermark lacks an essential and reasonably expected attribute – sufficient staffing capacity to provide residents with the care services they were assessed as needing, such that residents are routinely denied promised services.

107.    Watermark had exclusive and superior knowledge of material facts not known to the named Plaintiff, putative class members or the general public at the time of the subject transactions and actively concealed these material facts.

108.    Watermark had exclusive and superior knowledge of its corporate policy and procedure of understaffing as alleged herein. Further, Plaintiff alleges on information and belief that Watermark's officers, directors and managers, including Does 1 – 100, were repeatedly advised by their own staff that Watermark facilities were not adequately staffed to meet resident needs. Watermark also knew that its failure to provide staffing sufficient to deliver the services

CLASS ACTION COMPLAINT

residents were assessed as needing and for which they were charged posed a substantial health and safety risk to the named Plaintiff and class members.  Watermark intentionally concealed, suppressed and/or failed to disclose the true facts with the intent to defraud the named Plaintiff and putative class members. The named Plaintiff and the putative class members did not know these material undisclosed facts and could not reasonably have been expected to discover them.

109.    As a direct and proximate result of Watermark's conduct, Plaintiff, the class members, and members of the general public (including without limitation persons admitted to and/or residing in the facilities, and their family members and/or representatives) have been harmed and continue to be harmed.  Among other things, they paid money to Watermark to enter the facility and have also been charged monthly fees for services that were substandard to those promised by Defendants as a result of their misrepresentations, misleading statements and omissions. Accordingly, Plaintiff and the putative class members are entitled to restitution.

110.    Additionally, Plaintiff seeks an injunction that requires Watermark to immediately cease acts of unlawful, unfair and fraudulent business acts or practices as alleged herein, and to enjoin Watermark from continuing to engage in any such acts or practices in the future.  Plaintiff and the putative class members also seek reasonable attorneys' fees, costs and expenses, and all other remedies permitted by law.

**THIRD CLAIM FOR RELIEF**

**ELDER FINANCIAL ABUSE (Cal. W&I Code § 15610.30)**

111.    Plaintiff refers to, and incorporates herein by this reference, all preceding paragraphs.

112.    Plaintiff and the putative class members are and at all times were "elders" as defined under California W&I Code § 15610.27 and/or "dependent adults" as defined under California W&I Code § 15610.23.

113.    Watermark entered into a standard form agreement with the named Plaintiff and the putative class members and/or their personal representatives.  In these agreements, Watermark represented that Watermark determines and provides staffing at its assisted living facilities

1   sufficient to meet the needs of its residents as determined by Watermark's resident assessment

2   system. Watermark made this promise in exchange for new resident fees and services fees that it

3   received from the named Plaintiff and the putative class members.  Yet Watermark lacks an

4   essential and reasonably expected attribute – sufficient staffing capacity to provide residents with

5   the care services they were assessed as needing. Thus, Watermark does not staff its facilities at a

6   level to consistently provide the services it assessed its residents as needing in the aggregate. This

7   common practice precludes Watermark from providing its residents with the services it promised

8   to provide them in exchange for the Membership Fee and other monthly service fees.

9         114.    Watermark knew or should have known that such conduct would likely be harmful

10  to Plaintiff and the putative class members.

11        115.    Watermark knew or should have known that Plaintiff and the putative class

12  members had a right to the funds used to pay new resident entrance fees and monthly fees to

13  Defendants.

14        116.    As such, Watermark took, secreted, appropriated, obtained and retained the funds

15  of Plaintiff and the putative class members for a wrongful use and/or with the intent to defraud.

16        117.    Watermark's conduct was despicable, fraudulent, reckless, and carried out with a

17  willful and conscious disregard for the rights and safety of Plaintiff and the members of the

18  putative class.

19        118.    Accordingly, Plaintiff and the putative class seek an injunction requiring

20  Watermark to disclose to Plaintiff, the putative class members and the consuming public that

21  Watermark does not staff its assisted living facilities at a level to consistently provide the services

22  it assesses its residents as needing because its policies and procedures regarding staffing are

23  deficient and do not ensure that there is sufficient staffing to deliver promised services. Plaintiff

24  and the class also seek an injunction prohibiting Watermark from charging residents monthly care

25  fees based on their assessed personal care points unless or until Watermark ensures that those

26  points account for staff time sufficient to deliver to all residents all the needed services specified in

27  residents' assessments. Further, Plaintiffs and the class seek an injunction requiring Watermark to

28

CLASS ACTION COMPLAINT

disclose to prospective and current residents, their family members or responsible parties, and the class that Watermark's existing staffing policies and procedures preclude it from providing its residents with all the care and services they have been promised and are paying for.

119.    Plaintiff and the putative class members also seek compensatory damages, reasonable attorneys' fees, costs and expenses, punitive damages, treble damages pursuant to California Civil Code § 3345, and all other remedies permitted by law.  Plaintiff does not seek certification of any claims for damages related to any personal injuries, emotional distress or wrongful death suffered by any member of the class.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment as follows:

1.    For a Court order certifying that the action may be maintained as a class action;

2.    For statutory damages;

3.    For actual damages according to proof, excepting any damages for personal injury, emotional distress and/or wrongful death suffered by the named Plaintiff or any class member;

4.    For restitution and any other monetary relief permitted by law;

5.    For reasonable attorneys' fees, costs and expenses;

6.    For treble damages pursuant to California Civil Code section 3345;

7.    For punitive damages;

8.    For pre-judgment and post-judgment interest, according to law;

9.    For a public injunction requiring that Watermark immediately cease acts that constitute unlawful, unfair and fraudulent business practices, and violations of the Consumer Legal Remedies Act, Business and Professions Code section 17200 *et seq.*, and the Elder Financial Abuse statute as alleged herein, and to enjoin Defendants from continuing to engage in any such acts or practices in the future;

10.    For a public injunction requiring that Watermark disclose to the putative class members and the consuming public that Watermark does not staff its facilities at a

CLASS ACTION COMPLAINT

1   level to consistently provide the services it assessed its residents need in the

2   aggregate;

3   11.   For a public injunction prohibiting Watermark from charging fees based on care

4   points unless or until Watermark ensures that those points account for staff time

5   sufficient to deliver all the needed services specified in residents' assessments;

6   12.   For a public injunction requiring Defendants to disclose to prospective and current

7   residents, their family members or responsible parties, and the class that

8   Watermark's existing staffing policies and procedures preclude it from providing

9   its residents with all the care and services they have been promised and are paying

10   for; and

11   13.   For such other and further relief as the Court may deem just and proper.

12   ## JURY TRIAL DEMANDED

13   Plaintiff demands a jury trial on all issues so triable.

14   Dated:  March 6, 2023

16   Kathryn A. Stebner, State Bar No. 121088
Brian S. Umpierre, State Bar No. 236399
17   STEBNER GERTLER GUADAGNI & KAWAMOTO
A Professional Law Corporation
18   870 Market Street, Suite 1285
San Francisco, CA 94102
19   Tel:    (415) 362-9800
Fax:    (415) 362-9801

21   Guy B. Wallace, State Bar No. 176151
Mark T. Johnson, State Bar No. 76904
22   Jennifer U. Bybee, State Bar No. 302212
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
23   2000 Powell Street, Suite 1400
Emeryville, CA 94608
24   Tel:    (415) 421-7100
Fax:    (415) 421-7105

26   Attorneys for Plaintiff and the proposed Class

CLASS ACTION COMPLAINT