Kathryn A. Stebner, State Bar No. 121088
Brian S. Umpierre, State Bar No. 236399
**STEBNER GERTLER & GUADAGNI**
A Professional Law Corporation
870 Market Street, Suite 1285
San Francisco, CA  94102
Tel:  (415) 362-9800
Fax:  (415) 362-9801
Email: kathryn@sggklaw.com
          brian@sggklaw.com

Guy B. Wallace, State Bar No. 176151
Jennifer U. Bybee, State Bar No. 302212
**SCHNEIDER WALLACE COTTRELL KONECKY, LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel: (415) 421-7100
Fax: (415) 421-7105
Email: gwallace@schneiderwallace.com
          jbybee@schneiderwallace.com

*Attorneys for Plaintiff and the Settlement Class*

# UNITED STATE DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Joseph DeCarlo; on his own behalf, and on behalf of others similarly situated,<br><br>                    Plaintiff,<br><br>vs.<br><br>Watermark Retirement Communities, LLC; and Does 1 - 100,<br><br>                    Defendants. | CASE NO. 2:23-cv-01659-DSF-RAO<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:  July 21, 2025<br>Time: 1:30 p.m.<br>Ctrm.: 7D<br><br>Judge:  Honorable Dale S. Fischer<br>Magistrate:  Rozella A. Oliver |

1

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................. 6

II.   BACKGROUND ................................................................................. 7

    A.    Claims Asserted and Parties ................................................... 7

    B.    Case Proceedings and Informal Settlement Negotiations .......... 8

    C.    Formal Mediation ................................................................... 9

    D.    Preliminary Settlement Approval .......................................... 10

    E.    Settlement Class Notice ........................................................ 10

III.  SETTLEMENT PROVIDES SUBSTANTIAL BENEFITS ............................ 11

    A.    The Settlement Fund ............................................................ 11

    B.    Settlement Payments to Class Members ................................. 12

    C.    Stipulated Injunction ............................................................ 13

    D.    Release Provisions ................................................................ 14

    E.    Attorneys' Fees, Litigation Costs, and Service Award ............ 15

IV.   THE SETTLEMENT MEETS THE LEGAL STANDARDS FOR OBTAINING

    FINAL APPROVAL ........................................................................... 15

    A.    Strength of Plaintiff's Case ................................................... 16

    B.    Risk, Complexity, and Likely Duration of Further Litigation ... 19

    C.    Risk of Maintaining Class Certification ................................. 20

    D.    Amount Offered in Settlement ............................................... 20

    E.    Stage of Proceedings and Extent of Discovery Completed ....... 22

    F.    Experience and Views of Counsel .......................................... 22

    G.    Reaction of Class Members ................................................... 23

    H.    Agreement Not a "Product of Collusion" ............................... 23

V.     CONCLUSION..................................................................................................23

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL
APPROVAL OF CLASS ACTION SETTLEMENT

# TABLE OF AUTHORITIES

**Federal Cases**

*Don v. Unum Grp.*
  2016 WL 6821109 (C.D. Cal. Mar. 9, 2016) ................................................. 16, 18, 23

*Eagan v. Axa Equitable Life Ins. Co.*
  2010 WL 11508366 (C.D. Cal. Dec. 3, 2010) ............................................... 16, 19, 22

*Hesse v. Sprint Corp.*
  598 F.3d 581 (9th Cir. 2010) .............................................................................. 15

*In re Mego Fin. Corp. Sec. Litig.*
  213 F.3d 454 (9th Cir. 2000) .............................................................................. 22

*In re Netflix Privacy Litig*
  2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) .................................................... 20

*Kim v. Space Pencil, Inc.*
  2012 WL 5948951 (N.D. Cal. Nov. 28, 2012) ................................................... 16

*Knapp v. Art.com, Inc.*
  283 F.Supp.3d 823 (N.D. Cal. 2017) ................................................................. 19

*Linney v. Cellular Alaska Partnership,* 1997 WL 450064 (N.D. Cal. Jul. 18, 1997) ... 23

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*
  221 F.R.D. 523 (C.D. Cal. 2004) .................................................................. 20, 23

*Nguyen v. Nissan N. Am., Inc.*
  932 F.3d 811 (9th Cir. 2019) .............................................................................. 17

*Rodrgriguez v. W. Publ'g Corp.*
  563 F.3d 948 (9th Cir. 2009) .............................................................................. 20

*Serv. Com'n of City and County of San Francisco*
  688 F.2d 615 (9th Cir. 1982) .............................................................................. 22

*Staton v. Boeing Co.*
  327 F.3d 938 (9th Cir. 2003) ....................................................................... 16, 23

*Winans v. Emeritus Corp*

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL
APPROVAL OF CLASS ACTION SETTLEMENT

2016 WL 107574 (N.D. Cal. Jan. 11, 2016) ...............................................22

**Statutes**

Cal. Bus. & Prof. Code § 17200 .................................................................8

Cal. Civ. Civil Code § 1542 ......................................................................14

Cal. Civ. Code § 1750 ...............................................................................8

Cal. Civ. Code § 1752 ...............................................................................18

Cal. Civ. Code § 1780(b)(1) ......................................................................18

Cal. Civ. Code § 1780(b)(1)(C) .................................................................18

Cal. Civ. Code § 3345 ...............................................................................18

Cal. Welf. & Inst. Code § 15610.30 ...........................................................8

**Rules**

Rule of Civil Procedure 23(e)......................................................10, 15, 18, 20

**Regulations**

Cal. Code Regs. Tit. 22 § 87411(a) ............................................................13

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.    INTRODUCTION

In this case, Plaintiff Joseph DeCarlo ("Plaintiff") asserts claims on behalf of current and former residents of California assisted living facilities owned, managed, and/or operated by Defendant Watermark Retirement Communities, LLC ("Defendant" or "Watermark").

Plaintiff contends that, through representations made in its form admission contract ("Residency Agreements") and other conduct, Watermark leads consumers to reasonably expect that Watermark facilities will be sufficiently staffed to timely provide promised services. Undisclosed to consumers, however, Watermark's resident assessment system and staffing policies and procedures lack an essential and reasonably expected attribute – the staffing capacity to deliver promised services. As a result, Plaintiff contends that all class members sustain economic harm when they pay money to Watermark (in upfront Membership Fees and monthly Service Fees).

Watermark denies Plaintiff's allegations and claims in the lawsuit and denies that it committed any wrongdoing, including that staffing at its communities was or is insufficient. After extensive arm's-length negotiations conducted over the course of eighteen months, the parties have reached a settlement, pursuant to which Watermark has agreed to pay $3.5 million and stipulated to a Court-ordered injunction. Declaration of Brian S. Umpierre ISO Final Settlement Approval Motion ("Umpierre Decl."), Ex. A (Stipulation of Settlement ("SS")); Ex. B (Injunction).

As detailed below, the settlement clearly warrants final approval under the "fair, reasonable and adequate" test. *Chen v. Western Digital Corp.,* Case No. 8:19-cv-00909-JLS-DFM, 2021 WL 9720778 ("*Chen II*"), *4 (C.D. Cal. Jan. 5, 2021). The monetary payment is consistent with the amounts paid in comparable settlements in cases brought against other assisted living facility chains. The minimum projected per-class member payments (after Court-approved fees, administration costs, and

6

service award) exceed by approximately 30% the blended average payments in the comparable settlements. Umpierre Decl., ¶ 68, Ex. C (Updated Comparable Settlements Summary).

Importantly, the Injunction will substantially benefit Watermark residents (including Settlement Class Members) by implementing concrete requirements aimed at ensuring that facility staffing is sufficient to meet resident needs. The Injunction requires Watermark to determine and ensure that staffing hours are sufficient to perform the care tasks called for under resident assessments and to comply with California's staffing regulations. Injunction, ¶¶5-7. Further, the Injunction requires Watermark to provide quarterly reports of facility response times to resident calls for assistance (*id.*, ¶¶9-12), thereby encouraging the timely delivery of promised services and allowing Class Counsel to monitor Watermark's compliance with the Injunction. As all residents rely on the same group of care providers, Non-Class residents at Watermark facilities will also benefit from the staffing, training, and monitoring provisions. ECF 28-4 (Declaration of Cristina Flores in Support of Plaintiff's Motion for Preliminary Approval of Class Settlement ("Flores Decl.")), ¶¶ 13, 16. Additionally, the Disclosure provisions requiring changes to Watermark's Residency Agreement language will benefit consumers generally. Injunction, ¶¶1-4. In combination, the Injunction terms materially increase the likelihood that Watermark residents will receive promised care services. *See* ECF 28-4 (Flores Decl.), ¶15.

For these and the other reasons set forth below, the instant motion for final settlement approval should be granted.

## II.    BACKGROUND

### A.    Claims Asserted and Parties

This action was filed on March 6, 2023. Named Plaintiff Joseph DeCarlo asserted class claims on behalf of persons who resided in a Watermark California assisted living facility ("Watermark California Facility") since March 6, 2019. Plaintiff

asserted claims for damages and injunctive relief under California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, and Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and the Elder Financial Abuse statute, Cal. Welf. & Inst. Code § 15610.30. *See* ECF 21 (First Amended Complaint ("FAC")).

Watermark provides assisted living and memory care services for seniors and disabled persons throughout the United States, including California. The litigation class proposed in the FAC included residents from eighteen (18) Watermark California Facilities. *Id.,* ¶ 68. At present, Watermark operates seven (7) California assisted living facilities. The seven (7) assisted living facilities Watermark currently operates are subject to the stipulated Injunction, as defined therein.

**B.    Case Proceedings and Informal Settlement Negotiations**

When Plaintiff filed this action in March 2023, two other class action cases raising similar claims and legal theories were being advanced in the matters of *Heredia v. Sunrise Senior Living, LLC, supra,* pending in the Central District of California, and *Stiner, et al. v. Brookdale Senior Living, Inc., et al.,* No. 4:17-cv-03962-HSG (LB), pending in the Northern District. Ultimately, the Ninth Circuit affirmed the district court's grant of class certification in *Heredia* and class certification of these particular claims was denied in *Stiner.*[1] Thus, in an effort to avoid unnecessarily burdening the Court's resources and in order to receive the benefit of the Ninth Circuit's view on the substantially similar class certification issues, the parties requested and the Court granted requests to continue the case schedule to permit informal discovery and for the parties to evaluate their respective positions and consider settlement. Umpierre Decl.,

---

[1] The Ninth Circuit denied the *Stiner* plaintiffs' petition for review of the order denying their motion for class certification on May 31, 2023 and, on August 2, 2023, affirmed the *Heredia* court's order granting plaintiffs' motion for class certification. Umpierre Decl., ¶ 17.

¶¶ 16-18.

To that end, Defendant produced to Plaintiff documentary information in the form of company policies and procedures relating to (i) caregiver staffing, (ii) scheduling and labor management; and (iii) facility budgets. Umpierre Decl., ¶¶ 11, 19. Defendant also produced the template for its resident assessment form, its care point calculator tool, and average task time(s) it takes Watermark staff to complete caregiving tasks. *Id.* It is Plaintiff's position that all three are critical pieces of information for determining whether Defendant's resident assessment system has the capacity to provide sufficient levels of caregiver staffing under Plaintiff's legal theory of the case. Plaintiff also contends that all three form the basis of Plaintiff's common proof showing that common issues of law and fact predominate.

Crucially, the parties also agreed to the production of a subset of resident assessment and staffing (i.e., payroll) data from four facilities[2] for one-year periods to test the adequacy of Defendant's staffing levels. *Id.*, ¶ 20. With these data, Plaintiff was able to calculate any delta between the staffing required to deliver assessed care services ("workload") and actual staffing as reflected in Watermark's payroll data. *Id.*, ¶ 24. In July 2024, Plaintiff provided Defendant with his preliminary staffing analysis which Plaintiff contends indicated a staffing shortfall between the hours required to deliver assessed care services ("workload") and the actual labor hours available at two facilities. Plaintiff worked to refine the analysis while the parties continued to negotiate a possible resolution in advance of an autumn mediation. *Id.*, ¶ 25.

## C.    Formal Mediation

On September 30, 2024, Plaintiff provided Watermark with draft proposed terms of injunctive relief that call for the disclosure regarding Watermark's staffing policies

---

[2] The four facilities are The Watermark at Westwood Village and three facilities randomly selected by the parties. Umpierre Decl., ¶ 12, n.1.

and procedures and provisions regarding Watermark's compliance with applicable regulations requiring staffing levels sufficient to provide residents with the services sufficient to meet their assessed needs. *Id.,* ¶ 26.

On October 15, 2024, the parties participated in a day's-long mediation session with the Honorable Judge Gandhi in Los Angeles and reached agreement in principle to settle this matter. *Id.,* ¶ 27. Shortly thereafter, the parties informed the Court of the settlement in principle and requested a continuance of the case schedule to permit the parties to finalize the agreement and document its terms. On December 23, 2024, the Court adopted the parties' requested schedule for the filing of Plaintiff's motion for preliminary approval of class action settlement. *Id.,* ¶ 28.

### D. Preliminary Settlement Approval

Plaintiff's motion for preliminary approval of class action settlement came for hearing on March 17, 2025. During the hearing, the Court ordered that counsel provide a revised, redlined proposed order granting the motion for preliminary approval. The Court further directed that the revised order include appropriate time frames and dates regarding notice and further settlement approval proceedings. Umpierre Decl., ¶ 31. Plaintiff submitted a revised, proposed form of order and supporting declaration on March 18, 2025. *Id.* By order dated March 19, 2025, the Court granted Plaintiff's motion for preliminary approval of class action settlement after considering the relevant factors under the Rule of Civil Procedure 23(e) "fair, reasonable, and adequate" test and conditionally certified the proposed Settlement Class for settlement purposes only. ECF 33, ¶¶ 2-3.

### E. Settlement Class Notice

On May 1, 2025, the Settlement Administrator (CPT Group) substantially completed dissemination of the Settlement Class Notice to approximately 2,600 Class Members. Declaration of Jennifer Forst ("Forst Decl."), ¶ 4; Umpierre Decl., ¶ 96. Additional notices were sent on May 7, 2025 to approximately twenty-four Settlement

Class Members identified by Watermark after Watermark's initial provision of the class list to the Settlement Administrator. Forst Decl., ¶ 5. The total number of Settlement Class Members to whom notice was sent is 2,664. Forst Decl., ¶¶ 6-7. With a Class Notice Date of May 1, 2025 (Forst Decl., Ex. A; Umpierre Decl., ¶ 97), the optout/objection deadline is July 7, 2025. ECF 33 (Preliminary Approval Order), ¶¶ 12, 21.

## III.    SETTLEMENT PROVIDES SUBSTANTIAL BENEFITS

### A.    The Settlement Fund

Watermark has agreed to pay $3.5 million into a Settlement Fund to resolve all monetary obligations owed under the settlement. The $3.5 million cash payment is consistent with the amounts paid in comparable class settlements in relation to class size and other factors. Umpierre Decl., ¶¶ 66-71. In the closest comparable settlement by way of monetary recovery ($6.4M), the class size was over 13,000 persons, nearly five times larger than the Settlement Class here. *Id.,* ¶ 67.

The Settlement Fund will be used to pay attorneys' fees, litigation expenses, a service award, and class notice/settlement administration costs, all in amounts to be approved by the Court. Umpierre Decl., Ex. A (Settlement Stipulation ("SS")), ¶¶1.16, 9.1, 9.4. As detailed in the separate fee briefing, Plaintiffs are seeking $705,053 in attorneys' fees, reimbursement of $29,522.91 in litigation costs, and a service award of $5,000 for the Named Plaintiff. The Settlement Administrator's updated bid for notice and settlement administration costs is $62,000. Forst Decl., Ex. C. The amounts requested for all these items are at or below the amounts authorized under the Settlement Stipulation. SS, ¶¶1.16, 9.1, 9.4.

Factoring in an agreed-upon reserve of $25,000 to cover late claims (SS, ¶1.28), the Net Settlement Payment amount available to fund Settlement Awards will be approximately $2.67 million. Umpierre Decl., ¶ 35, Ex. C (Updated Comparable Settlements Chart). If the Court awards less than the requested amounts,

11

all non-awarded funds revert to the Settlement Fund for distribution to Settlement Class Members. SS, ¶¶9.3, 9.4. No portion of the Settlement Fund reverts to Watermark. SS, ¶7.9.

**B.    Settlement Payments to Class Members**

Assuming a Net Settlement Fund of approximately $2.67 million, the initial settlement distribution is projected to result in an average per-Settlement Class Member amount of approximately $1,002. Umpierre Decl., ¶¶ 40, 68. In the preliminary approval motion, Plaintiff estimated the average per-Class Member payment would be roughly $1,170. However, that estimate was based on Watermark's estimated Settlement Class size of 2,200 residents. ECF 28-1 at 6; ECF 28-2 (Umpierre Decl.), ¶ 13. After completing its file review to provide the Settlement Class Member list, Watermark determined that there are 2,664 Settlement Class Members, of whom six have opted-out as of the filing of this motion. Umpierre Decl., ¶ 40; Forst Decl., ¶ 15.

The projected $1,002 average initial payment compares favorably to the initial payments made in comparable assisted living settlements. In those cases, the average initial settlement payments ranged from $291 to $904, with an aggregate average payment of about $764 per class member. *See* Umpierre Decl., Ex. C (Updated Comparative Settlements Summary Chart). The projected initial settlement here ($1,002) exceeds the average amount achieved in the other comparable settlements by over $230 or 30%. *Id.*, ¶ 68.

Further, it is likely that there will be a supplemental distribution to Settlement Class Members (or their successors) who cash their initial settlement checks. In other assisted living settlements, 30% or more of the initial settlement checks were not cashed, resulting in substantial supplemental distributions. Umpierre Decl., ¶ 71. Here, the agreement directs the Settlement Administrator to distribute uncashed checks through a supplemental distribution. SS, ¶7.9. The Settlement Award payments will be

12

paid to Settlement Class Members (or if deceased, their legal successors) with no claim form requirement. The Settlement Administrator will exercise all reasonable efforts to deliver payments to Settlement Class Members, or if deceased, their legal successors. SS, ¶¶7.4-7.9; Forst Decl., Ex. C (Updated CPT Bid), pp. 1-3. For Settlement Class Members without a locatable current address, the Administrator is authorized to make payment pursuant to a "Distribution Request." SS, ¶¶7.4, 7.5. Further, the Settlement Administrator is authorized to pay late submitted claims from the Reserve Fund. SS, ¶1.28.[3]

## C.    Stipulated Injunction

The stipulated Injunction obligates Watermark to undertake and maintain substantive actions that will improve facility staffing and benefit both Watermark residents and consumers generally. The Injunction applies to the seven assisted living facilities that Watermark presently operates in California ("Watermark Injunction Communities"). The Injunction duration is 2.5 years (30 months). Umpierre Decl., Ex. B (Injunction), ¶18.

Under the "Staffing Requirements" in the Injunction, Watermark is required to ensure that staffing hours are sufficient to perform the care tasks called for under resident assessments. Further, the Injunction obligates Watermark to comply with California staffing regulations, including 22 CCR § 87411(a), which requires that the number of facility staff be sufficient to meet resident needs at all times. Injunction, ¶¶5-7.

Under the "Training Requirements," Watermark is required to provide annual

---

[3] The proposed Reserve Fund amount is $25,000. If the Administrator determines that monies left in the Reserve Fund (after all late claims are addressed) cannot be economically distributed to Plaintiff Class Members, the balance is to be distributed *cy pres*, subject to the Court approval. SS, ¶7.9. The proposed *cy pres* recipient is Groceries for Seniors, a non-profit that provides free food to elderly people in need. The parties and their counsel have no relationship with the proposed *cy pres* recipient. Umpierre Decl., ¶¶ 47-48.

training to facility personnel on timely response to call light requests, proper monitoring of resident care and how to appropriately staff its facilities. Injunction, ¶8. Watermark also is required to maintain records of the content and attendance of such training. *Id.*

Under the "Monitoring Requirements," Watermark must provide reports to Class Counsel showing facilities' response times to resident requests for assistance ("Call Light Request/Response Data") on a quarterly basis. *Id.*, ¶¶9-12. As the call light data show how quickly Watermark responds to resident requests, it provides an effective way to monitor whether facility staffing is sufficient to meet resident needs. Flores Decl., ¶¶ 12-13.[4]

In combination, the Staffing, Monitoring and Reporting ("STM") requirements of the Injunction provide substantive and verifiable means to address a critical issue raised in the lawsuit, namely, the sufficiency of facility staffing at Watermark facilities. Flores Decl., ¶ 15. Additionally, under the Disclosure provisions in the Injunction, Watermark is required to include affirmative disclosures in its residency agreements explaining how resident assessments are used to set facility staffing. Watermark also is required to refrain from misleading statements as to how assessments impact facility staffing. Injunction, ¶¶ 1-4.

### D. Release Provisions

Under the Settlement Stipulation, the Named Plaintiff and all Settlement Class Members (excluding opt-outs) will release all claims asserted, or which could have been asserted, against Watermark and the defined Released Parties based on the facts alleged in the lawsuit (SS, ¶¶1.24, 8.1), and waive the protections of California Civil Code § 1542 as to the released claims. SS, ¶8.3. The scope of the release complies with

---

[4] Because Class Counsel select the facilities and days required for Watermark's data production (Injunction, ¶¶11-12), Watermark has an incentive to ensure compliance at all facilities. Flores Decl., ¶ 13.

applicable law. *Hesse v. Sprint Corp.,* 598 F.3d 581, 590 (9th Cir. 2010).

The Release expressly excludes individual claims for personal injuries, wrongful death, bodily harm, or emotional distress, as well as claims for breach of the Settlement Stipulation or Injunction. SS, ¶1.24. The releases are effective only after the Court grants final settlement approval and the Effective Date is reached. SS, ¶8.1.

### E.    Attorneys' Fees, Litigation Costs, and Service Award

The Settlement Stipulation allows Plaintiffs to seek Court approval for attorneys' fees, reimbursement of litigation expenses/costs, and a service award. SS, ¶¶9.1 (fee request and litigation costs), 9.4 (service award capped at $5,000). But there is no "clear sailing" provision;[5] the Settlement Stipulation expressly provides that Plaintiffs may obtain only those amounts expressly approved by the Court, with any unawarded amounts added to the Settlement Fund for distribution to Settlement Class Members. SS, ¶¶ 7.9, 9.3, 9.4.

## IV.    THE SETTLEMENT MEETS THE LEGAL STANDARDS FOR OBTAINING FINAL APPROVAL

The law favors settlement of class-action lawsuits. *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004). Nevertheless, under FRCP 23(e), the proposed settlement must be "fair, reasonable and adequate." *Chen II*, 2021 WL 9720778, at *4.

To determine whether a proposed settlement warrants preliminary approval, factors considered include: (a) the strength of plaintiffs' case; (b) the risk, expense, complexity, and likely duration of further litigation; (c) the risk of maintaining class

---

[5] The parties met and conferred consistent with the Court's Order re Requirements for Motion for Attorneys' Fees, and, in light thereof and the parties' Stipulation of Settlement, Defendant does not intend to oppose Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Award, filed concurrently herewith. *See* Umpierre Decl., ¶ 36.

action status throughout the trial; (d) the amount offered in settlement; (e) the extent of discovery completed, and the stage of the proceedings; (f) the experience and views of counsel; and (g) the reaction of the class members to the proposed settlement. *See Staton v. Boeing Co.,* 327 F.3d 938, 959 (9th Cir. 2003); *see also Eagan v. Axa Equitable Life Ins. Co.,* No. CV 06-7637-DSF (JTLx), 2010 WL 11508366, at *2 (C.D. Cal. Dec. 3, 2010). Courts also consider whether the settlement is free of collusion or indicia of unfairness. *Don v. Unum Grp.,* No. CV-13-4502-DSF (VBK), 2016 WL 6821109, at *1 (C.D. Cal. Mar. 9, 2016).

### A.    Strength of Plaintiffs' Case

The Settlement provides substantial relief to the Class in the face of the inherent uncertainties of litigation. "The substantial and immediate relief provided to the Class under the Settlement weighs heavily in favor of its approval compared to the inherent risk of continued litigation, trial, and appeal, as well as the financial wherewithal of the defendant." *Kim v. Space Pencil, Inc.,* No. C 11-03796 LB, 2012 WL 5948951, at *5 (N.D. Cal. Nov. 28, 2012).

Through informal discovery and investigation efforts, Plaintiffs have marshalled significant evidence to support meritorious claims. That evidence includes voluminous information and documents regarding (i) facility staffing policies and procedures; (ii) resident assessment and care fee model and practices; (iii) electronic resident assessment and actual staffing/payroll data for selected facilities for and years; and (iv) Named Plaintiff's resident file, assessment, and care records. Plaintiffs contends that Watermark's failure to disclose material facts regarding the capacity of its resident assessment system to provide sufficient levels of caregiver staffing supports an economic injury claim (in the form of upfront Membership Fees and overpriced care services fees) for all residents.

For its part, Watermark denies any wrongdoing whatsoever and denies the allegation that staffing at its communities was or is insufficient. Watermark contends

16

that it operates its California communities in compliance with applicable laws and regulations, including those relating to staffing, and that the evidence proves that it appropriately staffs its communities. Watermark denies that Plaintiff or the Class have suffered any damages or harm. Further, Watermark denies that class treatment is appropriate under the circumstances due to what it claims are individual issues and individualized answers that would predominate this litigation.

Regardless, Plaintiff believes that the putative class faces some risk with respect to showing classwide damages. Under applicable California law, the measure of damages is the difference between what consumers paid and the value received. *Nguyen v. Nissan N. Am., Inc.,* 932 F.3d 811, 820 (9th Cir. 2019).

Plaintiff's strongest claim is for upfront Membership Fees, which are generally paid before any services are provided and thus are not subject to an offset defense. Plaintiffs contend they would not have paid these monies to Watermark if they had been informed that Watermark's staffing policies do not ensure that it has sufficient staff to deliver promised services to the residents. Here, the total Membership Fees paid by or on behalf of all Watermark residents during the class period is approximately $6.3 million. Umpierre Decl., ¶ 51. Calculating that approximately 84% of all residents are not subject to arbitration (2,664 residents not subject to arbitration out of 3,140 total during the class period), roughly $5.3 million can reasonably be attributed to amounts paid by or on behalf of class members. *Id*. According to Watermark, the average estimated fee paid per resident based on the total number of residents during the class period is approximately $2,029. *Id.*

Plaintiff's claim for care services fees is larger but is potentially subject to an offset defense for the value of the care services already provided to the residents. For this reason, settlement efforts focused on the value of the claim for Membership Fees. Umpierre Decl., ¶ 52. Plaintiff's preliminary staffing analysis provides a model upon which it is appropriate to base such an offset. *Id.* For example, the "shortfall" between

Watermark's actual staffing and the staffing required to provide promised services as reflected in the resident assessments can be used to estimate the "value" received. Thus, if it is determined that Watermark's actual staffing was 20% less than that required to provide promised services, the Service Fees charge would be reduced by a commensurate percentage. The difference between the amount actually paid and the adjusted price is recoverable as restitution or damages. *Id.* At trial, Plaintiffs would have to convince a judge or jury that Plaintiff's staffing analysis (i.e., the comparison of available time to meet required workload for delivering services) provides an appropriate basis to calculate damages. Watermark would likely challenge any such analysis and its findings as speculative and inconsistent with the allegedly satisfactory experience Watermark provides its residents.

Plaintiff also asserts a claim for CLRA statutory damages. Specifically, the CLRA authorizes statutory damages of "up to $5,000" for each class member. Cal. Civ. Code § 1780(b)(1). With a Settlement Class of 2,664 non-arbitration residents, the potential CLRA damages award is $13.3 million. Umpierre Decl., ¶¶ 53-54, 59 (2,664 times $5000). While statutory requirements for CLRA statutory damages are straightforward, the judge or jury must expressly find "an additional award" (*i.e.,* over and above the CLRA compensatory damages) is "appropriate." Cal. Civ. Code § 1780(b)(1)(C). Plaintiff further contends the CLRA statutory damage award is subject to trebling under Cal. Civ. Code § 3345. However, the lack of explicit statutory authorization for such trebling presents a risk to the adoption of Plaintiffs' position that remedies under the CLRA are cumulative to those provided for under other statutes. *See* Cal. Civ. Code § 1752. Accordingly, Plaintiffs has a risk that a judge or jury may view trebling as unwarranted, given the CLRA compensatory damage and statutory damage remedy.

With the 2018 amendments to Rule 23(e), courts consider the "likely range of possible classwide" recovery. *Chen,* 2020 WL 13587954, at *11; *see also Don,* 2016

WL 6821109, at *1. Assuming a favorable jury verdict, Class Counsel estimate the possible trial classwide recovery ranges from roughly $5.3 million to $39.9 million. Umpierre Decl., ¶¶ 59.

**B.    Risk, Complexity, and Likely Duration of Further Litigation**

On the merits, Plaintiffs believes they will prevail on the claims asserted at trial. But as detailed above, multiple potential hurdles must be cleared to prevail on liability and damages.

Absent settlement, the parties (and the Court) will expend significant additional time and resources to resolve this litigation. Until now, with the Court's permission the parties were engaged in a process that included informal discovery, investigation, and factual and legal analysis. Umpierre Decl., ¶¶ 11-12, 18-25. Given that process, there has been no pleading challenge to the First Amended Complaint. *Id.*, ¶ 56. Further, while informal discovery has been substantial, it has not included deposition discovery or expert discovery of any kind. Nor has there been any briefing on class certification and the issues attendant thereto. *Id.* All this work would need to be undertaken absent settlement and in advance of trial.

Thus, while Plaintiffs vigorously disputes Watermark's denials on the merits, the risks of litigation weigh in favor of settlement. *See Knapp v. Art.com, Inc.,* 283 F.Supp.3d 823, 832 (N.D. Cal. 2017) (approving settlement where "[c]ase law suggests that plaintiff would have faced challenges in continuing to litigate" and "unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results"); *Eagan,* 2010 WL 115008366, a *2 ("Court's role is not to determine whether the settlement 'could be prettier, smarter, or snazzier,' but whether it falls within the range of appropriate settlements.") citing *Hanlon,* 150 F.3d at 1027. Moreover, given the elderly status of Settlement Class Members, the potential for delayed or uncertain recovery weighs in favor of settlement. *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 526 (C.D. Cal.

2004) ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.").

### C.    Risk of Maintaining Class Certification

The risk of maintaining class action status through trial supports final approval. While the Court has preliminarily granted certification of the class for settlement purposes only, a class has not otherwise been certified in this case and Watermark will oppose certification if the case proceeds. SS, ¶ 2.2. *See In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, at \*6 (N.D. Cal. Mar. 18, 2013). Plaintiffs assert that certification for litigation purposes is appropriate here, but acknowledges that not all jurists have accepted Plaintiff's class certification position. Umpierre Decl., ¶ 58, n.5. If the Court declined to certify a class, putative class members would receive nothing. *See Chen*, 2020 WL 13587954, at \*11 (settlement "may provide the last opportunity for class members obtain relief"). And even if the Court did certify a litigation class, Plaintiffs would still face potential review on appeal and would need to prove the claims at trial, which carries serious expense and further delay – potentially delaying recovery for several years. In addition, Plaintiffs would always face the risk that a "district court may decertify a class at any time." *Rodgriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). The Settlement allows Plaintiffs to avoid these uncertainties in favor of immediate recovery.

### D.    Amount Offered in Settlement

Under the Settlement, Watermark has agreed to pay $3.5 million in cash and stipulated to a Court-ordered Injunction, which compares favorably with the "likely range of possible" classwide recovery (Fed. R. Civ. Pro. 23(e), Advisory Committee Note to 2018 amendment) as well as comparable settlements.

**Cash Payment.** The $3.5 million monetary payment is consistent with the amounts paid in comparable settlements given the size of the Settlement Class and the

20

litigation history of this case. Under the Settlement, the net Settlement Fund will provide for initial cash payments to the roughly 2,600 Settlement Class Members of $1,002. Umpierre Decl., ¶¶ 40, 68-70. That is consistent with the average amount of initial payments paid in comparable settlements. *Id.* If there is a supplemental distribution of unclaimed funds after the initial payment round (which is likely given the track history of uncashed checks in comparable settlements), the per-class member monetary payment will be higher. *Id.,* ¶ 71.

**Injunction.** As detailed above, the Staffing, Monitoring, and Training provisions in the Injunction impose specific obligations on Watermark that Plaintiffs believe will improve facility staffing and benefit both Watermark residents and consumers generally. *See* Flores Decl., ¶¶ 10-16. In multiple respects, these terms exceed the scope of injunctive relief that Plaintiffs may have obtained at trial. Compare FAC, Prayer, ¶¶ 9-10; Umpierre Decl., ¶ 46; *see Chen*, 2020 WL 13587954, at *11 ("expansive, robust, programmatic relief" in settlement, which plaintiff was "unlikely" to obtain at trial, supports settlement approval). Albeit more difficult to quantify, the Disclosure Requirements by which Watermark agreed to revise its Residency Agreements to include specific disclosures regarding how resident assessments are used in setting facility staffing, (Injunction, ¶¶ 1-4), provide additional value in assessing the overall settlement benefits. *See In re Ferrero Litig.,* 583 Fed.Appx. 665, 668 (9th Cir. 2014) (requirement that defendant provide "extra nutritional information" and follow "new [advertising] protocols" constitutes "meaningful" injunctive relief supporting class settlement approval).

**Comparison to Likely Recovery.** As noted, Plaintiff's strongest claim pertains to Membership Fees. *See* Section IV(A). Here, the overall settlement value ($3.5 million) is two-thirds (66%) of the estimated $5.3 million estimated to paid by non-arbitration residents in Membership Fees and is nearly 20% (18.9%) of Plaintiffs' total reasonably achievable trial recovery estimate. Umpierre Decl., ¶¶ 60, 69, Ex. C. The

21

anticipated average initial payment to Settlement Class Members ($1,002) is nearly half (49%) of the estimated average Membership Fee paid by all residents ($2,029). *Id.* The overall settlement value falls within the range of possible Court approval. *See, e.g., Eagan,* 2010 WL 11508366, at *2 ("The monetary relief provided for by the Settlement Agreement represents a reasonable percentage of what could be expected in plaintiffs were to proceed to trial and prevail."); *Winans v. Emeritus Corp.,* No. 13-cv-03962-HSG, 2016 WL 107574, at *5 (N.D. Cal. Jan. 11, 2016) (approved class settlement represents 33.2% of maximum hard damages). *See also In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 459 (9th Cir. 2000), quoting *Officers for Justice v. Civil Serv. Com'n of City and County of San Francisco,* 688 F.2d 615, 628 (9th Cir. 1982) (A "cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair.").

### E.    Stage of Proceedings and Extent of Discovery Completed

Formal litigation events notwithstanding, Defendant provided significant discovery that enabled the parties to focus on the core issues necessary to resolve this matter and, ultimately, reach a resolution with the assistance of Judge Gandhi. Umpierre Decl., ¶¶ 10-27. Plaintiff has conducted sufficient discovery to permit his counsel and the Court to intelligently and fairly evaluate the fairness and adequacy of the Settlement proposed herein. *Id.,* ¶¶ 74. This favors preliminary approval.

### F.    Experience and Views of Counsel

Class Counsel, who are experienced in class action litigation with the assisted living industry, believe the settlement is fair, reasonable, and adequate given the factors referenced above, including the strengths and potential weaknesses in the asserted claims. Umpierre Decl., ¶¶ 73-76 *See also* supporting Declarations of Class Counsel Kathryn Stebner, Guy Wallace, and David Marks, filed contemporaneously herewith. Endorsement of the settlement by qualified and well-informed counsel supports approval. *See Linney v. Cellular Alaska Partnership,* Nos. C–96–3008 DLJ,

22

C–97–0203 DLJ, C–97–0425 DLJ, C–97–0457 DLJ, 1997 WL 450064, at *5 (N.D. Cal. Jul. 18, 1997); *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528.

### G. Reaction of Class Members

Plaintiffs support the Settlement. ECF 28-3 (DeCarlo Decl.), ¶¶ 29-30. *See also* Appendix of Supplemental Settlement Class Member Declarations. CPT Group reports that, as of June 13, 2025, six (6) Settlement Class Members (out of 2,664) had opted-out of the Settlement and it has received no objections. Forst Decl., ¶¶ 15-16. Prior to hearing on final settlement approval, Plaintiffs will provide an update on Settlement Class Member reactions, including objection/opt-out responses. *See Chen,* 2020 WL 13587954, at *13. *See also* Umpierre Decl., ¶ 97.

### H. Agreement Not a "Product of Collusion"

The approval process requires consideration of whether the settlement is the product of collusion, with red flags including "clear sailing arrangements" for payment of fees separate from class funds, reversion of unawarded fees to the defendant, or an agreement to pay fees disproportionate to the settlement benefits. *In re Bluetooth,* 654 F.3d at 946-47; *Don,* 2016 WL 6821109, at *1.

Here, there are no clear sailing, defense reversion, or other "red flags" of actual or potential collusion. The settlement reflects extensive, hard-fought negotiations supervised by an expert mediator. SS, Recitals, ¶ D; Umpierre Decl., ¶¶ 20-29. The Settlement Stipulation expressly provides that Plaintiff may obtain only those amounts expressly approved by the Court, with any unawarded amounts added to the Settlement Fund for distribution to Settlement Class Members. SS, ¶¶ 7.9, 9.3, 9.4. The Ninth Circuit has specifically approved this approach for class settlements. *Staton,* 372 F.3d at 972.

### V. CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully requests that the Court grant final settlement approval.

23

Dated: June 16, 2025           */s/ Brian S. Umpierre*

Kathryn A. Stebner, State Bar No. 121088
Brian S. Umpierre, State Bar No. 236399
**STEBNER GERTLER & GUADAGNI**
870 Market Street, Suite 1285
San Francisco, CA 94102
Tel:   (415) 362-9800
Fax:   (415) 362-9801
Email:   kathryn@sggklaw.com
          brian@stebnerassociates.com

Guy B. Wallace, State Bar No. 176151
**SCHNEIDER WALLACE COTTRELL KONECKY, LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel:   (415) 421-7100
Fax:   (415) 421-7105
Email:  gwallace@schneiderwallace.com

Attorneys for Plaintiff and the Settlement Class

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT